IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

DAVID O. PETERSON              §
                               §
V.                             §        ACTION NO. 4:10-CV-365-Y
                               §
BELL HELICOPTER TEXTRON,       §
INCORPORATED                   §

ORDER GRANTING IN PART AND DENYING IN PART MOTION
FOR SUMMARY JUDGMENT AND DENYING MOTIONS TO STRIKE

Pending before the Court are Defendant's Motion for Summary Judgment (doc. 31), filed March 2, 2012; Plaintiff's Motion to Strike Portions of Defendant's Summary-Judgment Evidence (doc. 43), filed April 27; and Defendant's Motion to Strike (doc. 50), filed May 15.  The Court GRANTS in part and DENIES in part the motion for summary judgment and DENIES the motions to strike.

I.  BACKGROUND

A. FACTUAL BACKGROUND

1.  The Reduction in Force

In March 1989, defendant Bell Helicopter Textron, Incorporated ("Bell"), hired plaintiff David O. Peterson as a sales manager to sell helicopters in a geographic territory along the east coast. (Def. App. 702-04.) Part of Peterson's job was conducting flight demonstrations for potential customers; thus, Peterson was a licensed helicopter pilot.  (Pl. App. 126, 139-40.) In 2004, Peterson began reporting to the executive director of the North American sales group, Anthony Moreland. (Pl. App. 891.)  Moreland, in turn, reported to the vice-president for sales and marketing of the commercial-business unit, Robert Fitzpatrick.  (Pl. App. 218.)

Peterson received yearly performance reviews.  In 2005, Peterson received a rating of 3.2 (out of a possible 5.0) and his performance was "On Target/Solid."  (Def. App. 117.)  In 2006, Peterson's performance review showed his performance was "On Target/Solid."  (Def. App. 123.) He received a rating of 3.6.  When Peterson asked Moreland how he could receive a 5.0, Moreland told him that no sales manager received 5.0 ratings.  (Pl. App. 559.)  In 2007, Peterson received a 3.68 rating.  (Def. App. 130.)  Moreland also noted that Peterson "continues to lead by example" in his interactions with clients and, thus, asked Peterson to mentor new sales managers Jeanette Eaton and Pat Foley in 2007 and 2008.   (Pl. App. 240-43; Def. App. 125.)   In 2007, Bell began experiencing delays in producing its model 407 helicopter.  Thus, Peterson and other regional sales managers sold more 407 helicopters than Bell could produce.  (Def. App. 127; Pl. App. 275-76.)[1]

Moreland also prepared annual unit reviews for his sales group.  The July 2007 unit review was used for succession planning, determining promotions, and determining the impact of the loss of any of the sales managers.  (Pl. App. 311-12, 403-05.)  The sales managers' dates of birth apparently were included in the unit review.  (Pl. App. 415.)  Fitzpatrick has stated that ages were not a factor in any decisions based on the unit review.  (Def. App. 609.)

In early 2007, Moreland sent Peterson a memo about Peterson's "distribution of highly sensitive information to one of [Bell's] customers."  (Def. App. 144.)  It appears that Peterson forwarded an email to a customer that included an attachment providing access to some of Bell's

---

[1]Peterson argues that he was not allowed to submit or receive bonuses for his 407 helicopter orders.  (Pl. App. 559.)  However, the record shows that Peterson's orders were submitted and that he earned bonuses on some of his 407 orders in 2007 and 2008.  (Def. App. 265-66, 267-68, 269-70, 271-72.)  Peterson's unsupported statements in his declaration to the contrary are self-serving and contradicted by competent, plentiful, and independent evidence; thus, his statements cannot raise a genuine dispute regarding this material fact.  See Smith v. Sw. Bell Tel. Co., 456 F. App'x 489, 492 (5th Cir. 2012) (per curiam).

confidential information.  (Pl. App. 600.)  Peterson acknowledged the disclosure, but averred it was inadvertent.  (Def. App. 144.)  The security infraction resulted in the reduction of Peterson's February 2007 bonus and Peterson's removal from flight status for a period of six months.  A copy of Moreland's memo was placed in Peterson's personnel file.

In 2007 and 2008, Clint Suringer, an account manager, is alleged to have "made age-related remarks" about Peterson and Peterson's work, "including calling [Peterson]—in an uncomplimentary manner—'old school.'" (Pl. App. 560.)  Suringer would also imply that Peterson was "inflexible or unable to adjust to newer technology." (Def. App. 725.)  Peterson was offended by these "ageist" remarks and told Suringer to stop.  (Pl. App. 560.)  Peterson believed that Suringer's "age-based attitude" contributed to Peterson's problems with delayed orders and "keeping a deal sold." (Pl. App. 560.)

Shortly after Peterson's 2008 mid-year performance review, Moreland sent Peterson a memo, with a copy placed in Peterson's personnel file, about Peterson's "lack of performance over the last six months." (Def. App. 141.)  Moreland had three specific "areas of concern":

1.   Lack of Professionalism with regard to follow up with mentioned customers.

2.   Seeming disregard for [Moreland's] authority when repeatedly asked to close the files or follow up on the situation.

3.   Difficulty in properly prioritizing [Peterson's] work to ensure that open issues are not neglected.

(Def. App. 141.)  Moreland warned Peterson that he would place Peterson on a performance-improvement plan if Peterson did not improve, but Moreland never did.  (Pl. App. 282-83.)

On October 16, 2008, the United States Army notified Bell that it was canceling its contract with Bell to develop an armed reconnaissance helicopter.  (Def. App. 18.)  This represented a

significant loss of business for Bell; thus, on October 20, Bell's Executive Leadership Team ("the ELT") began preparing for a second[2] reduction-in-force ("RIF").  (Def. App. 771, 778, 792-93.) Bell's human-resources and finance departments recommended that a certain percentage of employees be laid off in the RIF to offset the lost business.  The ELT approved the recommendation. The human-resources department then gave the ELT a roster of data for each of the employees in their respective divisions.  (Def. App. 9, 23.)  The ELT agreed to select a percentage of employees for the RIF by applying selection criteria: (1) annual performance-review scores, (2) ranking of the employee's impact on the organization if laid off, and (3) any performance documentation in the employee's file.  Thus, the ELT determined whom to include in the RIF by comparing employees against their peers and selecting for termination those employees with the lowest rank based on the criteria. (Def. App. 10.)      Peterson's comparison group included Eaton, Foley, Gregory Maitlen, Steve Reyna, and Michael Coulman, i.e., all regional sales managers in North America.  (Def. App. 23-26.)  Based on  the end-of-year performance reviews, Peterson had the lowest scores for 2006 and 2007 in his comparison group.  (Def. App. 24, 583.)  Fitzpatrick, as a member of the ELT and as the supervisor for the marketing-and-sales division, took the data roster for that division and indicated, based on the selection criteria, "the priority that individuals were recommended for lay-off in the RIF until the target number of employees were recommended for lay-off."  (Def. App. 9-10.) Fitzpatrick indicated "with a '1'" that Peterson and one other marketing-and-sales employee were "his priorities for lay-off." (Def. App. 10.)  On October 22, either Fitzpatrick or Moreland prepared a "documentation worksheet" for each employee selected for the RIF, which was given to human resources.  (Def. App. 11.)  Peterson's documentation worksheet shows that he was the lowest

---

[2]Bell had conducted a "very, very small" RIF in May 2008.  (Def. Summ. J. App. 771.)

ranked sales-and-marketing employee based on his performance scores.  (Def. App. 24, 583.)

Attached to Peterson's documentation worksheet was a table listing the comparison group's

performance scores for 2006 and 2007 and also listing their ages.  (Def. App. 26.)  At the time the

worksheet was prepared, Peterson was 52.  Fitzpatrick stated that age was not a factor used to

determine which employees would be fired during the reduction in force.  (Def. App. 608-10.)

Shortly after the documentation worksheet was prepared and forwarded to human resources,

Moreland called Peterson and told Peterson that he was being laid off.  Moreland told Peterson,

"[Y]ou're my best guy and this has nothing to do with performance."  (Pl. App. 153, 561.)  Indeed,

Moreland had previously represented that Peterson was "one of our absolutely best aircraft salesmen

ever."  (Def. App. 541-42.)

On October 29, Bell's chief executive officer announced the RIF and stated that it would

affect "four percent of the Bell workers, including about 20 percent of [the] leadership team."  (Def.

App. 47.)  On October 31, Moreland formally met with Peterson to explain the termination

paperwork.  (Def. App. 545.)  Although Peterson asked why he was being laid off, Moreland said

he did not know why.  (Pl. App. 561.)  In the sales-and-marketing department, Bell asserts, and

Peterson does not dispute, that "thirteen management-level employees and six other employees,

including Peterson," were laid off.  (Mot. Br. 3.)  The RIF resulted in annual savings to the

marketing-and-sales department of more than two million dollars.  (Def. App. 156.)

2.  Peterson's Bonuses[3]

Peterson asserts that he when he was notified of his termination, Bell owed him several order and delivery bonuses.  Peterson's last day of employment was January 1, 2009.  Bell paid Peterson a gross amount of $44,905.80 as his 2008 third trimester bonus for deliveries made on or before December 31, 2008, plus an individual-performance-objective bonus of $7,206.94.  (Def. App. 157.) Peterson believed Bell still owed him $45,565.20 in order and delivery bonuses for ten separate helicopter orders Peterson believed he was responsible for.[4]  (Resp. 12-13.)  Peterson's bonuses were governed by a manufacturing-sales-incentive-and-compensation plan ("MSIP") that went into effect in July 2005 and continued through at least December 2008:

a)   Commission payouts will be paid to the person or persons who had the responsibility for and/or was the most instrumental in bringing in the business. . . .

b)   For Homeland Security sales to domestic non-federal agencies, where more than one plan participant is involved in the sale, 40% will be paid to Homeland Security and 60% to the regional sales manager.

. . . .

d)   An order received during a trimester is determined by Bell Helicopter's acceptance of a fully executed contract and receipt of the minimum non-refundable deposit or the equivalent financial vehicle that fully commits the customer to the execution of the contract.

e)   Successful delivery during a trimester is determined by Bell Helicopter's ability to recognize revenue on the transaction.

f)   If, for any reason, an order is cancelled at any time prior to delivery, any commission payment due upon delivery will not be paid and the initial 40% order payment may

---

[3]Although the agreement for these payments referred to them as "commissions," Peterson and Bell use "bonus" in their briefing.  The Court will use the parties' preferred term.

[4]Peterson also alleged Bell owed him bonuses for six additional orders.  (Def. App. 479-80.)  Peterson withdraws his claims for bonuses regarding these orders (Resp. 12 n.4); thus, the Court GRANTS Bell judgment as a matter of law on those claims.

6

require subtracting this amount from future commission payments[.]

(Def. App. 191, 625.)  A "sale" was defined in the MSIP as Bell's "receipt of a completed purchase agreement and a deposit."  (Def. App. 203.)  Regarding sales of new aircraft, partial bonuses were earned at the time of the order, with a second payment after delivery:

a) New unit sales commissions will earn 40% of the associated threshold commission at the time of order . . . .

b) Receipt of the order commission in no way provides full assurance that delivery commission will be earned and/or paid.

c) Plan participants eligible for new unit sales commissions will earn 60% of the associated threshold commission at the time of delivery provided the plan participant has successfully performed all necessary steps toward ensuring continued excellent service and responsiveness to the customer regarding their needs and communicating them prior to delivery of the product.

. . . .

e) For each product delivered during any trimester, whether initially contracted for sale before the trimester or during the trimester, the remaining delivery commission will be earned upon delivery of the aircraft.

(Def. App. 192.)

## B. PROCEDURAL BACKGROUND

On April 29, 2009, Peterson filed a charge of discrimination with the Equal Employment Opportunity Commission ("the EEOC").  (Pl. App. 568.)  Specifically, he asserted that he was fired "while a younger, less experienced employee was allowed to remain with the company" and that he "was replaced by a younger and less-experienced worker named Jeanette Eaton."  (Pl. App. 568.) He also complained that he had not been "compensate[d] . . . for several accounts that I brought in before my departure."  The EEOC issued Peterson a notice of his right to sue on March 2, 2010.  On

May 21, Peterson filed his complaint with this Court alleging claims of age discrimination[5] and breach of contract.

Bell now moves for judgment as a matter of law on Peterson's age-discrimination claim because Peterson neither established a prima-facie case nor rebutted Bell's legitimate-nondiscriminatory reason for the termination by showing the required statutory causation. Bell also argues that Peterson has not raised a genuine dispute as to any material fact regarding any breach by Bell of the MSIP. As would be expected, Peterson and Bell attack portions of the opposing summary-judgment evidence.

## II.  APPLICABLE LAW

### A.  SUMMARY JUDGMENT

When the record establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," summary judgment is appropriate. Fed. R. Civ. P. 56(a). "[A dispute] is 'genuine' if it is real and substantial, as opposed to merely formal, pretended, or a sham." *Bazan v. Hidalgo Cnty.*, 246 F.3d 481, 489 (5th Cir. 2001) (citation omitted). A fact is "material" if it "might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

To demonstrate that a particular fact cannot be genuinely in dispute, a defendant movant must (a) cite to particular parts of materials in the record (e.g., affidavits, depositions, etc.), or (b) show either that (1) the plaintiff cannot produce admissible evidence to support that particular fact, or (2) if the plaintiff has cited any materials in response, show that those materials do not establish

---

[5]Peterson does not argue a pattern-and-practice case of age discrimination, but rather argues disparate treatment based on his age.  (Resp. 23 n.56.)

the presence of a genuine dispute as to that fact. *See* Fed. R. Civ. P. 56(c)(1). Although the Court is **required** to consider only the cited materials, it **may** consider other materials in the record. *See id.* 56(c)(3). Nevertheless, Rule 56 "does not impose on the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 & n.7 (5th Cir. 1992). Instead, parties should "identify specific evidence in the record, and . . . articulate the 'precise manner' in which that evidence support[s] their claim." *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994).

In evaluating whether summary judgment is appropriate, the Court "views the evidence in the light most favorable to the nonmovant, drawing all reasonable inferences in the nonmovant's favor." *Sanders-Burns v. City of Plano*, 594 F.3d 366, 380 (5th Cir. 2010) (citation and internal quotation marks omitted). "[I]f no reasonable juror could find for the non-movant," summary judgment should be granted. *Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 424 (5th Cir. 2000) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

## B.  AGE-DISCRIMINATION CLAIMS

Plaintiff's discrimination claims are grounded in the Age Discrimination in Employment Act ("the ADEA") and the Texas Commission on Human Rights Act ("TCHRA"). Both the ADEA and the TCHRA prohibit employment-based discrimination based on an individual's age. *See* 29 U.S.C.A. §§ 623 (West 2008 & Supp. 2012); Tex. Lab. Code Ann. § 21.051 (West 2006). A disparate-treatment claim, which Peterson raises, refers to deliberate discrimination in the terms or conditions of employment. *See* 29 U.S.C.A. § 623(a)(1) (West 2008); *Powell v. Dallas Morning News L.P.*, 776 F. Supp. 2d 240, 257, 267 (N.D. Tex. 2011) (Stickney, Mag. J.). The presence of a prima-facie case under the TCHRA is subject to the same analysis as a prima-facie case under the

ADEA.  *See Quantum Chem. Corp. v. Toennies*, 47 S.W.3d 473, 475-76, 480-81 (Tex. 2001); *see also Harris v. Martinsville Indep. Sch. Dist.*, 448 F. App'x 474, 477-78 (5th Cir. 2011); *McClaren v. Morrison Mgmt. Specialists, Inc.*, 420 F.3d 457, 462 (5th Cir. 2005); *Vinson v. Chromalloy Gas Turbine, LLC*, No. 3:09-CV-1746-M, 2010 WL 4867566, at *4 n.29 (N.D. Tex. Nov. 23, 2010) (Lynn, Dist. J.).

      1.   Prima-Facie Case and Nondiscriminatory Reason: ADEA and TCHRA

Under the ADEA, it is illegal for an employer to discharge any individual who is at least 40 years old because of such individual's age.  *See* 29 U.S.C.A. §§ 623(a)(1), 631(a) (West 2008).  It also is illegal for an employer to classify its employees if such classification adversely affects the employee because of that employee's age.  *See id.* § 623(a)(2).

Because Peterson's age-discrimination claims are based on circumstantial rather than direct evidence of discrimination, the Court must employ a burden-shifting analysis.  *See McDonnell Douglas Corp. v. Green*, 411, U.S. 792 (1973).  To prevail, a plaintiff must establish a prima-facie case of age discrimination, which consists, in the reduction-in-force context, of evidence that: (1) the plaintiff is a member of a protected class; (2) the plaintiff was adversely affected; (3) the plaintiff was objectively qualified to assume another position at the time of discharge; and (4) the employer intended to discriminate in reaching its decision.[6]  *See Reeves v. Sanderson Plumbing*, 530 U.S. 133, 142 (2000); *Amburgey v. Corhart Refractories*, 936 F.2d 805, 811 (5th Cir. 1991); *Bienkowski v. Am. Airlines*, 851 F.2d 1503, 1506 & n.3 (5th Cir. 1988); *Tucker v. SAS Inst., Inc.*, 462 F. Supp. 2d 715, 725 n.3 (N.D. Tex. 2006) (Fish, C.J.).

---

[6]The Court notes that the standard for establishing a prima-facie case is significantly less stringent than the standard for establishing but-for causation under the ADEA.  *Cf. Long v. Eastfield Coll.*, 88 F.3d 300, 305 n.4 (5th Cir. 1996) (retaliation case).

Once a plaintiff demonstrates such a prima-facie case, an inference of discrimination arises. The defendant then carries the burden of production to articulate a legitimate, nondiscriminatory reason for its decision. *See Machinchick v. PB Power, Inc.*, 398 F.3d 345, 352 (5th Cir. 2005). However, the burden of persuasion always rests with the plaintiff. *See Reeves*, 530 U.S. at 142-43.

### 2.   Causation: ADEA

If the defendant articulates a legitimate, nondiscriminatory reason for its employment decision, an ADEA plaintiff must then offer sufficient evidence to create a genuine issue of material fact as to whether the employee's age was the but-for cause of the challenged adverse employment action. *See Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177-79 (2009). But an ADEA plaintiff continually shoulders the burden of persuasion to establish that age was the but-for cause of the employer's adverse action. *See id.*; *see also Vélez v. Thermo King de Puerto Rico, Inc.*, 585 F.3d 441, 447 n.2 (1st Cir. 2009); *Woehl v. Hy-Vee, Inc.*, 637 F. Supp. 2d 645, 651-52 (S.D. Iowa 2009). In other words, the employee must, if at trial, show—or, if during summary-judgment proceedings, raise a genuine dispute as to whether—the employer's proffered reason for its decision was pretextual and that age bias was the real reason for the employer's decision. *See Smith v. City of Jackson, Miss.*, 351 F.3d 183, 196 (5th Cir. 2003). Such but-for evidence has been explained as proof that age "actually motivated the employer's decision" or "actually played a role in that process and had a determinative influence on the outcome." *Hazen Paper Co. v. Biggins*, 507 U.S. 604 (1993); *see also Gross*, 129 S. Ct. at 2350.

In arguing but-for causation, an ADEA plaintiff must show that there is a conflict in the substantial evidence on the ultimate issue of age discrimination in order to withstand a motion for summary judgment. *Cf. Sherrod v. Am. Airlines, Inc.*, 132 F.3d 1112, 1122 (5th Cir. 1998)

11

(examining but-for causation in employment retaliation case). A mere scintilla of evidence of pretext will not create a genuine factual dispute in all cases. *See Crawford v. Formosa Plastics Corp., La.*, 234 F.3d 899, 902-03 (5th Cir. 2000). A plaintiff must adduce sufficient evidence to find that the employer's asserted justification is false. *See Reeves*, 530 U.S. at 148. "It is . . . possible for a plaintiff's evidence to permit a **tenuous** inference of pretext and yet be insufficient to support a **reasonable** inference of discrimination." *Crawford*, 234 F.3d at 903 (emphasis added). Thus, summary judgment would be appropriate "if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." *Reeves*, 530 U.S. at 148. Indeed, "instances exist where, although the plaintiff has established a prima[-]facie case and set forth sufficient evidence to reject the defendant's explanation, no rational fact-finder could conclude that the action was discriminatory." *Id.*

### 3. Causation: TCHRA

Under the TCHRA, however, this third step is different. *See Moore v. Delta Airlines, Inc.*, No. 3:10-CV-2241-K, 2012 WL 685414, *5-6 (N.D. Tex. Mar. 1, 2012) (Kindkeade, Dist. J.); *Vinson*, No. 2010 WL 4867566, at *4. If a TCHRA plaintiff demonstrates a prima-facie case of age discrimination and if the defendant articulates a legitimate, nondiscriminatory reason for its decision, the TCHRA plaintiff then must establish that age was "a motivating factor" for the employment decision. Tex. Lab. Code Ann. § 21.125(a) (West 2006); *Quantum Chem.*, 47 S.W.3d at 479-80. The TCHRA contemplates a mixture of legitimate and illegitimate motives that may be proven through circumstantial or direct evidence. *See* Tex. Lab. Code Ann. § 21.125; *Quantum Chem.*, 47 S.W.3d at 481. Thus, a TCHRA plaintiff alleging age discrimination must show either (1) the

employer's reasons were not true and were a pretext for discrimination or (2) even if the employer's reasons were true, another motivating factor was the employee's age. *See Kokes v. Angelina College*, 148 S.W.3d 384, 393 (Tex. App.—Beaumont 2004, no pet.). If the TCHRA plaintiff meets this burden, the employer has a defense to "limit its damage exposure" by showing it would have "taken the same action even in the absence of the impermissible motivating factor." Tex. Labor Code Ann. § 21.125(b) (West 2006); *Reber v. Bell Helicopter Textron, Inc.*, 248 S.W.3d 853, 858 (Tex. App.—Fort Worth 2008, no pet.); *see also Quantum Chem.*, 47 S.W.3d at 475-76.

## III. DISCUSSION

### A. AGE DISCRIMINATION UNDER THE ADEA AND THE TCHRA

#### 1. Prima-Facie Case Under the ADEA and the TCHRA

Peterson argues he received disparate treatment from what his younger peers received during the reduction in force. Bell only challenges the fourth element of Peterson's prima-facie case. (Mot. Br. 11.) In other words, Bell asserts that Peterson has not established, through competent summary-judgment evidence, the presence of a genuine dispute that Peterson was replaced by someone younger, that Bell otherwise treated Peterson less favorably than similarly-situated younger employees, or that individuals outside the protected class remained in similar positions. *See Faruki v. Parsons S.I.P., Inc.*, 123 F.3d 315, 318-19 (5th Cir. 1997); *Meinecke v. H&R Block of Houston*, 66 F.3d 77, 83 (5th Cir. 1995).

Peterson first asserts that because he was replaced by someone younger—Eaton—this satisfies the fourth element of his prima-facie case of age discrimination. (Compl. 3 at ¶ 11.)

13

However, Bell did not replace Peterson; rather, Bell assigned Eaton to take over Peterson's duties as well as her own after Peterson was terminated.  (Def. App. 622-23, 662.)  In the reduction-in-force context, reassignment of duties to another employee does not constitute replacement.  *See Horak v. Glazer's Wholesale Drug Co.*, No. 3:05-CV-901-K, 2006 WL 2017110, at *4 (N.D. Tex. July 19, 2006) (Kinkeade, Dist. J.), *aff'd*, No. 06-10854, 2007 WL 713154 (5th Cir. Mar. 6, 2007).

Peterson next argues that evidence that younger employees remained in similar positions after he was fired establishes the fourth element of his prima-facie case.  (Resp. Br. 22.)  In support, Peterson points to younger regional sales managers who were retained after the reduction in force:[7]

| Employee | Date of Birth | Age at Reduction in Force |
|---|---|---|
| Jeanette Eaton | 6-17-1965 | 43 |
| Patrick Foley | 1-4-1961 | 47 |
| Greg Maitlen | 4-11-1971 | 37 |
| Steve Reyna | 8-14-1967 | 41 |

(Def. App. 15.)  The Court cannot consider Eaton, Foley, or Reyna in examining Peterson's prima-facie case because these employees, although younger than Peterson, were within the protected class (i.e., employees over 40) and cannot constitute evidence that Bell retained employees outside the class.  *See Ptomey v. Tex. Tech Univ.*, 277 S.W.3d 487, 493 n.7 (Tex. App.—Amarillo 2009, pet. denied).  But Maitlen was outside the protected class and was retained while Peterson, who was a part of the protected class, was terminated.  Further, Suringer made age-based comments about Peterson's performance.  As noted above, the presence of a prima-facie case of discrimination is

---

[7]Another regional sales manager was retained after the reduction in force, but he was older than Peterson.  As Peterson avers, because Peterson does not raise a pattern-and-practice claim, Bell's retention of an older regional sales manager is not relevant to Peterson's prima-facie case.  *See Walther v. Lone Star Gas Co.*, 952 F.2d 119, 123 (5th Cir. 1992).  It may, however, be relevant to rebut the inference of discrimination.  *See id.*

14

"relatively easy" to establish and the requirements are "minimal." *See Thornbrough v. Columbus & Greenville R.R. Co.*, 760 F.2d 633, 639, 641 n.9 (5th Cir. 1985); *see also Amburgey v. Corhart Refractories Corp.*, 936 F.2d 805, 813 (5th Cir. 1991). Here, the Court concludes that Peterson has raised a genuine dispute regarding the fourth element of his prima-facie case by producing evidence that a younger employee, outside the protected class, was retained after the reduction in force and that Suringer made age-based comments about Peterson. *See, e.g., Bauer v. Albemarle Corp.*, 169 F.3d 962, 967 (5th Cir. 1999); *Acker v. Deboer, Inc.*, 429 F. Supp. 2d 828, 841 (N.D. Tex. 2006) (Buchmeyer, Sr. Dist. J.); *Rosenblatt v. 7-Eleven, Inc.*, No. 3:06-CV-957-D, 2007 WL 2187252, at *5 (N.D. Tex. July 27, 2007) (Fitzwater, Dist. J.). By meeting the minimal requirements of a prima-facie case of age discrimination, a rebuttable presumption of intentional discrimination arises.

### 2. Legitimate, Nondiscriminatory Reason Under the ADEA and the TCHRA

To rebut the intentional-discrimination presumption, Bell shoulders the burden of production to articulate a legitimate, nondiscriminatory reason for firing Peterson. *See Amburgey*, 936 F.2d at 811. As with Peterson's prima-facie case, this burden is relatively easy. *See id.* at 813. A reduction in force presumptively is a legitimate, nondiscriminatory reason for a discharge. *See Equal Emp't Opportunity Comm'n v. Tex. Instruments, Inc.*, 100 F.3d 1173, 1181 (5th Cir. 1996); *Rosenblatt*, 2007 WL 2187252, at *6. As part of that reduction in force, Peterson was chosen for termination based on his low scores. Thus, Bell has met its burden of production, and the burden shifts to Peterson to raise a genuine issue of material fact as to causation, i.e., whether Bell's proffered reason was merely a pretext for age discrimination. *Medina v. Ramsey Steel Co.*, 238 F.3d 674, 680 (5th Cir. 2001).

### 3. Causation Under the ADEA

15

Under the ADEA, Peterson must now offer sufficient evidence to create a genuine dispute of material fact as to whether the his age was the but-for cause of his termination.  In other words, Peterson must raise a genuine dispute as to whether Bell's proffered reasons for its decision, i.e., the reduction in force and its established criteria, were pretextual and that age bias was the real reason for Bell's decision.

"In most disparate-treatment cases, if an employer in fact acted on a factor other than age, the action would not be prohibited . . . in the first place."  *Smith v. City of Jackson, Miss.*, 544 U.S. 228, 238 (2005).  Thus, Peterson faces "enormous hurdles" in raising a fact issue as to but-for causation.  Ann Marie Tracey, *Still Crazy After All These Years?  The ADEA, the Roberts Court, and Reclaiming Age Discrimination as Differential Treatment*, 46 AM. BUS. L.J. 607, 629 (2009).  After *Gross*, "disparate[-]treatment claims under the ADEA will fail when the employer's decision was motivated by both impermissible and permissible factors.  A plaintiff lacking direct evidence, of course, would face extreme difficulty proving that age was the sole consideration in the employer's decision."  R. Henry Pfutzenreuter IV, *The Curious Case of Disparate Impact Under the ADEA: Reversing the Theory's Development Into Obsolescence*, 94 MINN. L. REV. 467, 488 n.160 (2009).  With a reduction in force, Peterson can raise a genuine dispute as to pretext by proffering competent summary-judgment evidence that (1) he was "clearly better qualified" than similarly-situated younger employees who were not terminated,[8] (2) the reduction in force was a sham or a pretext for age discrimination, or (3) although the reduction in force was legitimate on its face, Bell

---

[8]It appears that evidence a plaintiff was clearly better qualified would rebut a legitimate, nondiscriminatory reason for termination only if the employer's legitimate, nondiscriminatory reason was that the plaintiff was less qualified than retained employees.  *See Manning v. Chevron Chem. Co.*, 332 F.3d 874, 882 (5th Cir. 2003).  Here, Bell's proffered reason for terminating Peterson was the reduction in force.  But because Peterson and Bell address this rebuttal argument, the Court will address it as well.

implemented it in such a way that age was impermissibly used as a factor to determine which employees were terminated. *Nichols v. Loral Vought Sys. Corp.*, 81 F.3d 38, 42 (5th Cir. 1996); *see Patrick v. Ridge*, 394 F.3d 311, 317 (5th Cir. 2004).

Peterson first asserts that he was clearly better qualified than the retained employees because he had more "years of experience with [Bell]" and "more experience selling aircraft." (Resp. 24, 39.)  Although Peterson had been employed by Bell longer than the other retained sales managers, there is no evidence, other than his subjective averments, that he had more experience selling aircraft or that the retained sales managers had fewer "critical skills" than Peterson. *See, e.g., Carthon v. Johnson Controls, Inc.*, 100 F. App'x 993, 997 (5th Cir. 2004) (per curiam).  (Pl. App. 415, 562; Resp. 39.)  Further, length of service with a company does not equate to evidence of superior qualifications.  *See Nichols*, 81 F.3d at 42; *Vinson*, 2010 WL 4867566, at *5.

To the extent Peterson relies on Suringer's comments to show pretext, such reliance is misplaced.  Suringer was not a decision maker, and his comments were isolated, indirect, and ambiguous.  *See Palasota v. Haggar Clothing Co.*, 342 F.3d 569, 576-78 (5th Cir. 2003); *Tex. Instruments*, 100 F.3d at 1181.  Thus, Suringer's comments are insufficient to raise a genuine dispute as to pretext.  *See Cherry v. CCA Props. of Am., LLC*, 438 F. App'x 348, 352 (5th Cir. 2011) (per curiam); *Cray v. E. Baton Rouge Parish Sch. Bd.*, 340 F. App'x 239, 240-41 (5th Cir. 2009) (per curiam); *cf. Powell*, 776 F. Supp. 2d at 269-71 (holding similar evidence insufficient to constitute direct evidence of age-based bias).  Likewise, Moreland's assertion to Peterson that he was not being laid off based on his performance is insufficient to raise a genuine dispute as to whether age bias was the real reason for Peterson's lay off.  *See, e.g., Grimes v. Tex. Dep't of Mental Health & Mental Retardation*, 102 F.3d 137, 141-43 (5th Cir. 1996); *Kent v. Roman Catholic Church of the*

17

*Archdiocese of New Orleans*, No. 96-1505, 1997 WL 30201, at *3 (E.D. La. Jan. 23, 1997).

Peterson's other pretext arguments focus on Bell's reduction-in-force criteria and the ELT's process: (1) Bell was unable to identify the ultimate decision maker, (2) the selection criteria "evolved over time," (3) Bell considered age during the decision process, (4) Bell did not review personnel files prior to making the reduction selections, (5) the scoring was "highly subjective, inconsistent, and unreliable," and (6) Peterson was ranked evenly with other sales managers in 2007. (Resp. 31-38.)  Again, to raise a genuine dispute as to pretext, Peterson must produce evidence on which a jury could infer that the proffered reason was false and evidence that age was **the** real reason. *See Powell*, 776 F. Supp. 2d at 275.

Peterson's arguments fail to raise a genuine dispute that age was the real reason he was selected for the reduction in force.  The above reasons raised by Peterson do not detract from the veracity of Bell's proffered reason.  Peterson had the lowest performance scores for 2006 and 2007 among those sales managers that were considered for the reduction in force.  (Def. App. 23-26, 140, 579-85, 726.)  As pointed out by Bell, it identified the decision maker for the reduction in force for Peterson's department: Fitzpatrick.  (Def. App. 799; Reply 3-4.)  Although Fitzpatrick could not remember details of how he made the final decision, he never denied that he made it based on the documentation forwarded to him by human resources.  (Reply 3-4; Pl. App. 381-91, 542-43.)  *Cf. Turner v. Kan. City S. Ry. Co.*, 675 F.3d 887, 901-04 (5th Cir. 2012) (plurality op.) (in analyzing whether employer proffered a nondiscriminatory reason for firing, employer's action in misidentifying final decision maker for four years rendered employer's nondiscriminatory reason insufficient).

Further, Peterson's attacks on the specifics of Bell's rank-and-stack procedure are unavailing

to produce a genuine dispute as to whether age was the but-for reason for Peterson's selection. The evidence shows that the criteria used in the reduction in force were objective and standardized. Although the ages of the members of Peterson's comparison group were included with Peterson's documentation worksheet, this does not meet Peterson's burden to raise a factual dispute as to whether age was the sole consideration Fitzpatrick used in deciding to fire Peterson. *See Chapman v. Dallas Morning News, L.P.*, No .3:06-CV-2211-B, 2008 WL 2185389, at *9 (N.D. Tex. May 27, 2008) (Boyle, Dist. J.). Further, Peterson's attacks on the method Bell used in ranking the employees for the reduction in force is an attack on Bell's good-faith belief as to Peterson's performance that does not equate to evidence of pretext. *See Little v. Republic Ref. Co.*, 924 F.2d 93, 97 (5th Cir. 1991). Peterson does not argue that any manager, supervisor, ELT member, or human-resources employee that had input into the decision to fire Peterson had any discriminatory motive in applying the criteria to Peterson. In short, Peterson's arguments amount to an assertion that the relevant personnel decision was arbitrary or erroneous, which is not the relevant inquiry. The Court may address only unlawfully motivated personnel decisions. *See Bienkowski v. Am. Airlines, Inc.*, 851 F.2d 1503, 1507-08 (5th Cir. 1988); *Armstrong v. City of Dallas*, 829 F. Supp. 2d 875, 882 (N.D. Tex. 1992) (Sanders, C.J.). Thus, Peterson has failed to meet his burden of persuasion to rebut Bell's legitimate, nondiscriminatory reason by raising a genuine dispute as to whether age actually motivated Bell's decision or actually played a role in that process and had a determinative influence on the outcome.

## 4. Causation Under the TCHRA

As explained above, the causation element of Peterson's rebuttal arguments to Bell's legitimate, nondiscriminatory reason is less stringent under the TCHRA. Because Peterson has

demonstrated a prima-facie case of age discrimination and Bell proffered a nondiscriminatory reason for its decision, Peterson now must establish that age was a motivating factor for the employment decision by showing either (1) Bell's reasons were false and were a pretext for discrimination or (2) even if Bell's reasons were true, another motivating factor was the employee's age. *See Kokes*, 148 S.W.3d at 393. Peterson does not allege that Bell's proffered reason—the reduction in force—was false.[9] Therefore, the Court turns to whether Peterson has raised a genuine dispute as to whether Peterson's age was another motivating factor for Bell's decision.

Peterson has adduced evidence that a Bell employee commented that Peterson was "old school" and "unable to adjust" to newer technologies. The information Fitzpatrick reviewed to determine who would be affected by the RIF included the employees' ages. Although Fitzpatrick stated he did not consider age in making the decision, giving conclusive effect to Fitzpatrick's denial is a credibility determination that the Court is not permitted to make on summary judgment. Additionally, Moreland told Peterson that the decision to fire Peterson had "nothing to do with performance" even though that was the nondiscriminatory reason Bell gave for Peterson's termination—low performance scores. (Pl. App. 153, 561.) Moreland also noted Peterson led by example and requested Peterson mentor several new sales managers. This evidence is sufficient to raise a genuine dispute as to whether Peterson's age was a motivating factor in the decision to fire him. *See Quantum Chem.*, 47 S.W.3d at 481-82. Although Bell has a statutory affirmative defense to Peterson's motivating-factor evidence, neither Bell nor Peterson moves for judgment as a matter of law based on Bell's available defense. Therefore, Bell is not entitled to judgment as a matter of

---

[9]Peterson does argue that Bell's reason for including him in the RIF—Peterson's low performance—was untrue and pretextual. (Resp. 2, 35.) This argument is addressed below.

law on Peterson's discrimination claim under the TCHRA.

## B. Breach of Contract

Peterson also alleges that Bell breached the MSIP by failing to pay him for the sales bonuses he earned before the RIF.  A breach of contract claim consists of four elements: (1) the existence of a valid contract, (2) performance or tendered performance by the plaintiff, (3) breach by the defendant, and (4) damages sustained by the plaintiff resulting from the defendant's breach.  *See Mullins v. TestAmerica, Inc.*, 564 F.3d 386, 418 (5th Cir. 2009).  Peterson argues that he is owed $45,565.20 in bonuses.[10]  Bell asserts that there is no genuine dispute that it breached the MSIP.

Peterson argues he was due a $4,800 delivery bonus for an aircraft sold to West Virginia and a $7,719.20 order bonus for an aircraft sold to Challenger.  (Resp. 42)  West Virginia and Challenger canceled the orders before the aircraft were delivered, but after Peterson was fired.  (Def. App. 147, 150, 320,639-639a.)  The MSIP provided that if an order is canceled, any delivery bonus would not be paid and the order bonus would be subject to forfeiture.  (Def. App. 191.)  Thus, Peterson was not entitled to a delivery or an order bonus for the canceled orders.  Peterson asserts that because the West Virginia aircraft was subsequently sold to another customer after West Virginia canceled its order, Bell recognized revenue under the MSIP, which equates to a successful delivery subject to a delivery bonus.  (Resp. 43.)  However, Bell's uncontroverted evidence[11] shows that the revenue it received from the sale of the aircraft canceled by West Virginia was not the "revenue recognition"

---

[10]As noted above, Peterson has withdrawn his claim for $70,954.80 in bonuses.  Thus, the Court will only consider Peterson's claims for the disputed $45,565.20 amount.  (Resp. 12-13; Reply 9.)

[11]Peterson points to testimony allegedly showing Bell "owed Peterson $7719.20 for the Challenger . . . order." (Resp. 44.)  But this testimony referred to a document that was prepared before Challenger canceled the order.  (Pl. App. 457, 472.)

contemplated by the MSIP.  (Def. App. 148, 246; Mot. Br. 25.)

Peterson next asserts that he was due an $11,200 order bonus for the sale of two 429-model

aircraft to the Fairfax County Police Department:

> Both Fairfax County P.D. 429 orders were secured with a letter of intent and
> ultimately delivered to the customer.  Fairfax County P.D. offered to put down a
> deposit, but Contract Administration rejected the offer because orders from
> governmental or law enforcement customers are usually secured only by a letter of
> intent and a deposit is not required or, in this case, wanted by [Bell].

(Pl. App. 563.)  The MSIP specifies that a sale triggering an order bonus occurs when Bell receives

a completed purchase agreement and a deposit.  (Def. App. 191, 203.)  Bell would allow government

customers to make an order by signing a purchase agreement with no deposit; however, a letter of

intent was never considered a sale under the MSIP.  (Def. App. 638.)  Fairfax County Police

Department did not place its orders for the 429-model aircraft under the MSIP until March 9 and

September 30, 2011, which dates were after Peterson left Bell.  (Def. App. 155.)  Peterson testified

that the letters of intent merely were "advance orders" that were "contingent."  (Def. App. 709a,

761-62.)  Under the MSIP, the letters of intent did not constitute a sale triggering Peterson's right

to an order bonus.

Peterson asserts he was owed a $3,316 order bonus for an aircraft ordered by the Virginia

Beach Police Department.  This sale and delivery triggered the automatic 60-40 split with Bell's

homeland-security department.  (Def. App. 191.)  Although Bell paid Peterson a delivery bonus

under the MSIP (Def. App. 150), Bell did not pay Peterson the appropriate order bonus because Bell

contends David Cruz, a salesman with the homeland-security department, was the only salesman

listed on the paperwork for the order.  (Mot. Br. 28; Def. App. 345.)  But Peterson states that Cruz

had nothing to do with these orders, and Peterson provides emails showing Peterson's involvement with the details of the order by the Virginia Beach Police Department.  (Pl. App. 564, 631-34.) Further, the fact that Bell paid Peterson a delivery bonus would tend to show that he was involved in the order and, thus, entitled to an order bonus under the MSIP.  At the very least, Peterson has raised a genuine dispute as to whether he was due an order bonus for the order of the Virginia Beach Police Department.

Peterson contends he was owed a $3,240 order bonus for an aircraft order by the North Carolina Highway Patrol.  Bell has proffered affidavit evidence in which Bell's corporate representative states that Bell paid Peterson a $3,696 order bonus in early 2008 for this order.[12] (Def. App. 151.)  Peterson averred that he was not paid the order bonus.  (Def. App. 494; Pl. App. 562.)  These controverting statements raise a genuine dispute as to this material fact that cannot be resolved on summary judgment.  *See C.R. Pittman Constr. Co. v. Nat'l Fire Ins. Co. of Hartford*, 453 F. App'x 439, 443 (5th Cir. 2011) (per curiam op. on reh'g) ("[A]n affidavit based on personal knowledge and containing factual assertions suffices to create a fact issue even if the affidavit is arguably self-serving.").

Finally, Peterson argues that he was due delivery bonuses for aircraft (serial numbers 53654, 53655, 53680, and 53693) sold and delivered to the Federal Bureau of Investigation ("the FBI") before he was fired.  Serial numbers 53654, 53655, and 53680 ("the first three aircraft") were sold before the MSIP was effective; thus, he was "eligible to receive the commission for that sale upon delivery."  (Def. App. 168; Mot. Br. 29 n.170.)  Peterson was paid a $2,500 order bonus for each of the first three aircraft.  (Def. App. 253.)  Bell argues that the evidence shows Peterson was not

---

[12]No party explains the difference in the amount Peterson claims he is owed and the amount Bell claims it paid.

mentioned as being involved in the first three aircraft sales.  (Mot. Br. 29.)  Peterson states in his

declaration that he was extremely involved in the first three aircraft sales.  (Pl. App. 564.)  These

facts raise a genuine dispute as to whether Peterson was owed delivery bonuses for the first three

aircraft.  Likewise, there is a genuine dispute as to serial number 53693 based on Peterson's

averment that he was involved in this sale and, thus, should have been paid a delivery bonus under

the MSIP.  *See id.*

### C. MOTIONS TO STRIKE

#### 1. Peterson's Motion to Strike

Peterson seeks to strike several portions of Bell's summary-judgment evidence.  *See* Fed. R.

Civ. P. 56(c)(4).  Peterson first attacks portions of the affidavit of the director of Bell's homeland-

security-sales department.  The Court agrees with Bell's arguments that the challenged statements

are sufficiently limited to refute Peterson's arguments that they are based on hearsay, speculative,

and not based on personal knowledge.  (Resp. 2-4.)  Likewise, Bell adequately responds to

Peterson's arguments seeking to strike portions of Jennifer Knight's and Cindy Winget's affidavits.

(Resp. 4-10.)  There is no need to repeat those arguments here.  It is sufficient to say that Bell has

shown the challenged summary-judgment evidence meets the requirements of Rule 56(c)(4).

#### 2. Bell's Motion to Strike

Bell seeks to strike portions of Peterson's declaration.  First, Bell argues several of

Peterson's averments refer to statements by his supervisors, which violates the best-evidence rule

and are inadmissible hearsay.  (Mot. 2-3.)  *See* Fed. R. Evid. 801, 1002.  But, as Peterson explains,

these statements are not hearsay and are not subject to the best-evidence rule.  (Resp. 2-7.)  Bell also

objects to several of Peterson's declarations because they are conclusory and speculative.  (Mot. 3-4.)  But Peterson's statements are based on his personal knowledge.  (Resp. 8.)  Finally, Bell contends that Virginia Beach's letter of intent is not properly authenticated and may not be considered on summary judgment.  (Pl. App. 636.)  As Peterson argues, this exhibit appears to be self-authenticated.  *See id.* 902(1).  Even if it was not self-authenticated, the Court did not rely on this letter of intent in deciding Bell's summary-judgment motion.  Further, it is not disputed that Virginia Beach signed a letter of intent to purchase aircraft from Bell; thus, this is not a material fact affecting Bell's summary-judgment motion.

## IV.  CONCLUSION

Bell is entitled to judgment as a matter of law as to Peterson's claims that Bell violated the ADEA because Peterson failed to raise a genuine dispute as to whether age was the but-for cause of Peterson's termination.  However, Peterson has raised a genuine dispute as to whether Bell violated the TCHRA based on summary-judgment evidence that age was a motivating factor in the discharge. The Court also grants Bell judgment as a matter of law as to those breach-of-contract claims withdrawn by Peterson.  Bell is entitled to summary judgment on Peterson's breach-of-contract claims arising out of disputed delivery and order bonuses related to orders by West Virginia, Challenger, and the Fairfax County Police Department.  Peterson has, however, raised a genuine dispute as to whether he was owed order bonuses for orders placed by the Virginia Beach Police Department and the North Carolina Highway Patrol and delivery bonuses for orders placed by the FBI.  The parties' arguments to portions of the opposing summary-judgment evidence are without merit.

SIGNED October 3, 2012.

_____

TERRY R. MEANS

UNITED STATES DISTRICT JUDGE